## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Edward S. Kiel |
| | : | |
| | : | Mag. No. 20-15370 |
| v. | : | |
| | : | **CRIMINAL COMPLAINT** |
| RENATO GIOE, | : | |
| a/k/a "GINO" | : | |

I, Ronald Pascale, Jr., being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation ("FBI") and that this complaint is based on the following facts:

### SEE ATTACHMENT B

Continued on the attached page and made a part hereof:

_____/s/ Ronald Pascale_____
Special Agent Ronald Pascale, Jr.
Federal Bureau of Investigation
*Special Agent Pascale attested to this affidavit by telephone pursuant to FRCP 4.1(b)(2)(A).

Sworn to and subscribed me telephonically,
August 5, 2020 in Newark, New Jersey

HONORABLE EDWARD S. KIEL          _____/s/ EDWARD S. KIEL_____
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

## ATTACHMENT A

### COUNT ONE
(Making Extortionate Extensions of Credit)

From in or around 2017 through in or around September 2019, in the District of New Jersey and elsewhere, the defendant,

**RENATO GIOE,**
**a/k/a "GINO"**

did make an extortionate extension of credit as defined in 18 U.S.C Section 891(6).

In violation of Title 18, United States Code, Section 892(a).

### COUNT TWO
(Collecting Extortionate Extensions of Credit)

From in or around 2017 through in or around September 2019, in the District of New Jersey and elsewhere, the defendant,

**RENATO GIOE,**
**a/k/a "GINO"**

did knowingly and intentionally participate in the use of extortionate means to collect and attempt to collect one or more extensions of credit.

In violation of Title 18, United States Code, Section 894(a).

**ATTACHMENT B**

I, Ronald Pascale, Jr., am a Special Agent with the Federal Bureau of Investigations ("FBI").  I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and photographs of the evidence.  Where statements of others are related herein, they are related in substance and part.  Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation.  Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

**Introduction**

1.  At all times relevant to this Criminal Complaint:

    a.  Defendant Renato "GINO" GIOE (hereinafter "GIOE") was a resident of Monmouth Beach, New Jersey.

    b.  Company-1 was a company engaged in the "Merchant Cash Advance" or lending business that was located in Philadelphia, Pennsylvania.

    c.  Individual-1 was one of the owners of Company-1.

    d.  Victim-1 was a resident of New Jersey.

    e.  Company-2 was a business located in Toms River, New Jersey. Company-2 was owned and operated by Victim-1.

    f.  The Gambino Crime Family is part of a nationwide criminal organization known by various names, such as "the Mafia", "La Cosa Nostra," and "the MOB" which operates through entities known as "families."   The Gambino Crime Family, including its leadership, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

    g.  The Gambino Crime Family operated through groups of individuals, headed by persons called "captains" or "capos", who control "crews" that consist of "made" members who, in turn,

control subordinates, who are known as "associates" of the Family. "Made" members are elevated to their position through induction ceremonies in which they pledge fealty, or allegiance, to the enterprise for life.  The "made" members often referred to themselves, as "amica nostra", "friends of ours" or "wise guys". Capos approve all significant actions taken by made members and associates on behalf of the enterprise.  In return, the Capo typically received a share of the illegal earnings of each crew, referred to as "tribute."  Otherwise, a "made" member controls the day to day criminal activities of his own crew, and enjoy the benefits of their criminal activities.

h.  Defendant GIOE and Individual-1 were both "Associates" of the Gambino Crime Family.

i.  The Gambino Crime Family, through its leaders, members, and associates, both engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1)-namely:

  i.  multiple offenses involving the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under the laws of the United States, in violation of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances), Section 841 (distribution and possession with intent to distribute controlled substances), and Section 843(b) (use of a communication facility to violate the Controlled Substances Act).

  ii.  multiple offenses indictable under Title 18, United States Code, Sections 1341 and 1343.

  iii.  multiple offenses indictable under Title 18, United States Code, Section 891.

  iv.  multiple offenses indictable under Title 18, United States Code, Sections 1081 and 1084.

**Extortionate Extensions of Credit**

2.  Beginning on or about May 30, 2017, Victim-1 borrowed money in the amount of approximately $400,000 from Company-1 for the benefit and

use of both Victim-1 and Company-2. Victim-1 proceeded to make payments on the loans to Company-1.

3. In or around Fall of 2017, Victim-1 was contacted by Defendant GIOE regarding the loans that Victim-1 took from Company-1. At this time, Defendant GIOE informed Victim-1 that Defendant GIOE was an employee of Company-1 and the "cousin" of Individual-1, and that Victim-1 was delinquent in his loan payments to Company-1. In turn, Victim-1 and Defendant GIOE agreed on a payment schedule for the existing loans.

4. Victim-1 made loan payments to Company-1 via check, United States currency, and wire transfer from both his/her personal funds as well as the funds of Company-2.

5. When Victim-1 informed Defendant GIOE that both he/her as well as Company-2 could no longer afford to make loan payments to Company-1, Defendant GIOE offered to provide Victim-1 with additional financing.

6. From in or around 2018 through in or around June 2019, Defendant GIOE loaned a total of approximately $175,000 to Victim-1.

7. On several occasions, employees of Company-1 and associates of Individual-1 contacted personal and business associates of both Victim-1 and Company-2 to inform them that Victim-1 was not timely with the large loan payments that were owed to Company-1.

8. Defendant GIOE made loans to Victim-1 in varying amounts of approximately $20,000, $30,000, and $54,000 at a time. These loans were usually given to Victim-1 by Defendant GIOE in U.S. Currency, however on at least one occasion, Defendant GIOE wrote a check to Victim-1.

9. The terms of the loans that Defendant GIOE made to Victim-1 were such that the weekly payments that Victim-1 paid to Defendant GIOE were not counted towards the principal of the loans. For example, Victim-1 made weekly payments to Defendant GIOE in the amount of approximately $4,500 in U.S. currency for approximately a six month time frame on a loan he received from Defendant GIOE in the amount of approximately $54,000. However, these weekly payments did not go toward paying down the principal amount of the loan owed to Defendant GIOE.

10. At times, Defendant GIOE loaned money to Victim-1 for the purpose of Victim-1 to earn money by playing poker and then repay the loan in a full lump sum payment to Defendant GIOE with any poker winnings. For example, on one occasion Defendant GIOE loaned approximately $5,000 to Victim-1 and Victim-1 was able to pay approximately $7,000 to

Defendant GIOE in a two week time frame due to winning $7,000 by playing poker.

11.   In or around the Spring of 2019, Victim-1 informed Defendant GIOE that he/she would have to close down Company-2 and file for bankruptcy. At this time, Defendant GIOE became extremely angry with Victim-1 and threw an object against the wall. Victim-1 became afraid for his/her safety. Victim-1 attempted to leave the location of this incident but was stopped by Defendant GIOE.

12.   Defendant GIOE regularly sent hostile and threatening communications in the form of text messages to Victim-1. Specifically, Victim-1 received the following text messages from Defendant GIOE, in sum and substance:

     a. On or about May 20, 2019, Defendant GIOE sent "If u [sic] think fir [sic] a second you ain't paying you are dead wrong. . ."

     b. On or about August 28, 2019, Defendant GIOE sent "U [sic] do realize you are easy to find. . . I have every single address that's dear. . . Im smarter than u [sic]. . ."

     c. On or about September 6, 2019, Defendant GIOE sent "Every dog has their day. They got hit teams by u [sic] know who going to [location of Victim-1's residence]. Daddy mommy first."

     d. On or about September 10, 2019, Defendant GIOE sent "If you think for one second you can walk away from money u [sic] owe your [sic] nuts."

     e. On or about September 13, 2019, Defendant GIOE sent "Do yourself a favor start deposit 3k in my account a week, be smart brother, real smart. . . you are findable."

     f. On or about September 16, 2019, Defendant GIOE sent "I see u [sic] enjoyed the Borgata this Saturday nite [sic] . . . eyes everywhere."

13.   On or about September 22, 2019, Defendant GIOE arrived at the residence of Victim-1. Defendant GIOE began screaming at Victim-1, who directed his/her spouse to "call 911". During this incident, Defendant GIOE stated to Victim-1, in sum and substance, "You can't run from me" and "I'm going to kill you".  Defendant GIOE also spit on Victim-1's face twice. At this point, Victim-1 went into the residence to wash his face and exited the residence where he again encountered Defendant GIOE.

Defendant GIOE continued to yell at Victim-1 while Victim-1 got down on his knees.

14.   Officers with the Toms River Police Department (the "officers") reported to a 911 call placed by Victim-1. Upon arriving on the scene, the officers observed Victim-1 on his/her knees conversing with another male that they later identified as Defendant GIOE. When Defendant GIOE observed the officers arriving on the scene, he directed Victim-1 to tell the officers that they were going to "work it out" and that "everything was fine." However, Victim-1 did not comply with this request and spoke to the officers about some of the background and current situation. After the officers spoke with both parties on the scene, Victim-1 and Defendant GIOE spoke to each other and indicated to the officers that no further police involvement nor a formal report was desired.

15.   Due to this incident, the multiple threatening text messages, Defendant GIOE's associates and background, and other evidence, Victim-1 has and does fear that that delay in making payments to Defendant GIOE or failure to make payments to Defendant GIOE could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of himself/herself or to the person of Victim-1 relatives.